UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| KENTUCKIANA MEDICAL CENTER, LLC | ) | CHAPTER 11 |
| | ) | |
| Debtor | ) | CASE NO. 10-93039-BHL-11 |
| | ) | |

**MOTION TO GRANT LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS PURSUANT
TO SECTIONS 105, 363, AND 364 OF THE BANKRUPTCY CODE**

Comes the Debtor, Kentuckiana Medical Center, LLC ("KMC" or "Debtor"), by proposed counsel, and respectfully requests that the Court enter an order pursuant to sections 105(a), 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure 2002, 4001(c) and 9014 (the "Bankruptcy Rules") authorizing the Debtor to incur post-petition financing on a secured superpriority administrative expense basis (the "Motion"). In support of the Motion, the Debtor respectfully represents as follows:

**Introduction**

1. On September 19, 2010 (the "Petition Date"), Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to manage its property and operate its business pursuant to §§ 1107(a) and 1108.

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. The statutory predicates for the relief requested are Sections 105, 363, 365 and 1146 of the Bankruptcy Code and Rules 2002, 6004, 6006, 9008 and 9014 of the Bankruptcy Rules.

**Background**

4. The Debtor is an Indiana limited liability company and the operator of an acute care hospital located in Clarksville, Indiana (the "Hospital"). KMC offers a range of care including cardiovascular, oncology, urology, internal medicine and plastics within its 36-bed facility. As such, KMC is a "health care business" as that term is defined in § 101(27A). As of the Petition Date, KMC employs approximately 180 individuals.

5. KMC is a for-profit acute care medical facility owned in part (49%) by Cardiovascular Hospitals of America ("CHA"), in part (49%) by Kentuckiana Investors, LLC which is comprised of a group of thirty (30) local physician investors, and in part (2%) by Larry and Leslie Robertson. KMC opened its doors to the public in August 7, 2009. At the time it opened, the Hospital was operating with ten (10) beds, three (3) operating rooms, and one (1) catheterization lab.

6. As of August 2009, when KMC opened, it did not have contracts with the major insurance companies in the area nor did it have its Medicare provider number. KMC received its Medicare provider number on September 18, 2009 and did not finalize contracts with insurance companies until January 2010. As a result, KMC was operating at the outset at a substantial loss and without the security of payment for its services.

7. In February 2010, KMC engaged the services of Dean Dorton Ford, PSC to consult with it regarding the development and implementation of a plan to make KMC profitable.

8. By June 2010, KMC increased its bed capacity to thirty-four (34) and was operating with an average daily census of twenty-two (22) in-patients. KMC's financial performance was improving but remained insufficient to service its debt. As a result, KMC engaged Conway MacKenzie to assist with management and restructuring in July 2010.

9. Subsequent to the engagement of Conway MacKenzie, KMC made significant improvements in its operating systems and procedures resulting in improved monitoring of revenue

management cycle activities. Additionally, KMC has worked towards the re-negotiation of key commercial contracts and other cost-savings activities.

10. Despite the improvements made, KMC continued to be unable to fully service its debts. As a result, Debtor's primary secured creditor, First Tennessee Bank National Association ("FTB"), initiated a freeze on the Debtor's operating account with FTB on September 8, 2010. Subsequent to freezing the operating account, FTB honored checks written prior to September 8, 2010 and permitted wire transfers to Cardinal Health for Debtor's pharmaceutical needs. FTB indicated that all checks issued after September 8, 2010 would need prior authorization from FTB. As of the Petition Date, FTB has not approved any checks written on September 8, 2010 or thereafter.

11. In addition to the freeze, FTB began sweeping the funds out of the Debtor's operating account on September 13, 2010 and continuing through the Petition Date. As a result, Debtor cannot meet its debt obligations to creditors, including its payroll obligations.

12. Upon information and belief, as of the Petition Date, Debtor had eleven (11) secured creditors. Among the Debtor's secured creditors, FTB is the only secured creditor asserting a blanket lien security interest in "all of Debtor's property and assets, whether now existing or hereafter acquired," to include Debtor's cash collateral.

13. Prior to the Petition Date, approximately eighty percent (80%) of the Hospital's suppliers have demanded COD payments from the Hospital. This requirement has hampered the cash flow of the Hospital.

7. In addition, FTB, on or about September 8, 2010, began attaching all funds Debtor held in its bank accounts with FTB and began withdrawing the funds from the accounts in payment of the Debtor's outstanding debts owed FTB.

14. As a result, the Debtor is unable to meet its payroll and payroll tax obligations that

were due on September 17, 2010. Approximately fifteen (15) members ("Contributing Members") of Kentuckiana Investors, LLC, the 49% owner of Debtor ("KI"), have agreed to loan Debtor the necessary funds to meet its payroll and payroll tax obligations which were due on September 17, 2010 and are not yet paid. A list of the Contributing Members is attached hereto as Exhibit "A."

15. In order to cover the Debtor's payroll and taxes, the Contributing Members have agreed to provide the necessary funds, in an amount not less than $100,000.00 and not more than $375,000.00, to meet Debtor's September 17, 2010 payroll obligation and has agreed to deposit that amount into the Debtor's account (the "DIP Financing"). As a condition of the DIP Financing, the Contributing Members have requested that the DIP financing be on a secured basis.

16. An immediate need exists for KMC to obtain financing in order to preserve the value of its business and assets as debtor-in-possession under Chapter 11 of the Bankruptcy Code and to minimize the disruption of the Debtor as a going concern. KMC is unable to obtain financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense or solely in exchange for the grant of a super-priority administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code; and other than the financing from the Contributing Members, the Debtor is unable to obtain financing in the form of credit secured by liens that are junior to existing liens on property of the Debtor's estate pursuant to Section 364(c)(2) and (c)(3) of the Bankruptcy Code. The relief sought in the Motion is necessary to avoid immediate and irreparable harm and injury to the Debtor's estate.

17. Without the support of the DIP Financing, Debtor is not able to sustain its current operations due to ongoing cash needs.

**RELIEF REQUESTED**

18. By this Motion, the Debtor requests the entry of an order (the "Order") authorizing the Debtor to: (a) obtain post-petition DIP Financing, and (b) grant liens and superpriority

4

administrative expense status to the Contributing Members pursuant to sections 363 and 364 of the Bankruptcy Code.

19. The Debtor requests that the Debtor be authorized to pay the DIP Financing principal balance without interest to the Contributing Members over a six (6) week period without further order of the Court.

### APPROVAL OF THE POST-PETITION LENDING FACILITY IS WARRANTED UNDER THE CIRCUMSTANCES

20. The Debtor submits that ample justification exists for the approval of the proposed DIP Financing under section 364 of the Bankruptcy Code. An immediate and critical need existed for the Debtors to obtain funds from DIP Lender in order to continue the operation of the Facilities.

21. Section 364(c) of the Bankruptcy Code authorizes a debtor-in-possession to obtain post-petition credit:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(l) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

22. Courts have articulated a three-part test to determine whether a debtor-in-possession is entitled to financing under section 364(c) of the Bankruptcy Code: whether (a) the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an

5

administrative claim; (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores. Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *In re Crouse Group. Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).

24.   The Debtor is unable to obtain credit that is not secured and is not granted superpriority administrative claim status. Under these circumstances, and given the Debtor's current financial status and the immediate need for funds, the Debtor believes that the Contributing Members will not provide financing to the Debtor, other than on a secured and superpriority basis. The Debtor can show "by a good faith effort that credit was not available without" the protections of section 364(c)." *Bray v. Shenandoah Federal Say, and Loan Ass'n (In re Snowshoe Co.* 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); See *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992); *In re Sky Valley*, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."), aff'd sub nom., *Anchor Say. Bank FSB v. Sky Valley, Inc.*, 99 B. R. 117, 120 n.4 (N.D. Ga. 1989); see also *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996) (holding that debtor was entitled to relief under section 364(c) after providing evidence that only one entity of several solicited would provide the debtor with post-petition financing upon the condition of superpriority for such loans).

25.   Without the DIP Financing, the Debtor will not be able to assure the continued operation of the Debtor's business in a manner that will avoid irreparable harm to the Debtor and its estate. The ability of the Debtor to finance the Hospital's operations and the availability to the

6


Debtor of sufficient working capital and liquidity through the incurrence of new indebtedness and other financial accommodations are necessary to the confidence of the Facilities' vendors and suppliers of other goods and services, to their patients and employees and to the preservation and maintenance of the going concern value of the Debtor's estate. For these reasons, access to credit under the DIP Financing is critical to the Debtor's operation and necessary to preserve the assets of the Debtor's estate for the benefit of its creditors.

26. Furthermore, the Debtor submits that this Court should defer to the Debtor's business judgment which led the Debtor to determine that the terms of the DIP Financing are reasonable under the circumstances and should be approved by this Court. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money. *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Cob. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus.. Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Hamilton Square Associates*, No. 91-14720S, 1992 WL 98294, at *1 (Bankr. E.D.Pa. May 5 1992) (holding that a "debtor in possession's business judgement must be accepted if reasonable."). As one court has noted, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311(5th Cir. 1985).

27. In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *See In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 849 (Bankr. W.D. Pa. 1987) (holding that "the court should not interfere with or second-guess the debtor's sound business judgement unless and until evidence is presented that establishes that the debtor's decision was one

7

taken in bad faith or in gross abuse of its retained business discretion."); *See also In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted); *In re Lynx Transport, Inc.,* No. 98-36433DAS, 1999 WL 615366, at *3 (Bankr. E.D.Pa. Aug. 11, 1999) (holding that "a debtor- in-possession (DIP) is authorized to make its own independent business judgements.").

28. The terms and conditions of the DIP Financing were negotiated in good faith and at arms length by the Contributing Members and KMC and, accordingly, the Debtor believes that any credit extended and loans made to the Debtor under the DIP Financing should be deemed to have been extended in good faith, within the meaning of section 364(e) of the Bankruptcy Code.

## MODIFICATION OF THE AUTOMATIC STAY

29. Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition pursuant to the Bankruptcy Code. The Order contemplates a modification of the automatic stay (as necessary) to permit the Debtor to grant the applicable liens and to perform the obligations specified as part of the DIP Financing. Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities, and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

## CONCLUSION

30. The Debtor has exercised sound business judgment in determining that the DIP Loan is appropriate and has satisfied the legal prerequisites to borrow under the DIP Financing. The terms of the DIP Financing are fair and reasonable and are in the best interests of the Debtor's estates. Accordingly, the Debtor requests the Court grant authority to enter into the DIP Financing and to borrow funds from the Contributing Members on the secured administrative "superpriority" basis

described above, pursuant to section 364(c) of the Bankruptcy Code, and take the other actions contemplated and requested herein.

**WHEREFORE,** the Debtor respectfully requests that this Court enter the Order pursuant to sections 105(a), 363, 364(c) and 105(a) of title 11 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(c), and 9014 authorizing the Debtor to incur post-petition financing on a secured superpriority administrative expense basis on the terms described in this Motion and the Order and grant such other and further relief as the Court deems just and proper.

        Respectfully submitted,

        /s/ David M. Cantor
        DAVID M. CANTOR
        NEIL C. BORDY
        CHARITY B. NEUKOMM
        TYLER R. YEAGER
        SEILLER WATERMAN LLC
        Meidinger Tower - 22nd Floor
        462 S. Fourth Street
        Louisville, Kentucky 40202
        Telephone: (502) 584-7400
        Facsimile: (502) 583-2100
        E-mail: cantor@derbycitylaw.com
        E-mail: bordy@derbycitylaw.com
        Proposed Attorneys for Debtor

## **CERTIFICATE OF SERVICE**

It is hereby certified that on September 20, 2010, a true and correct copy of the foregoing Motion to Grant Liens and Superpriority Administrative Expense Status Pursuant to Sections 105, 363, and 364 of the Bankruptcy Code was served by U.S. Mail, facsimile and/or electronic mail to the United States Trustee for the Southern District of Indiana, all Secured Creditors of the Debtor, the 20 Largest Unsecured Creditors as designated in the Debtor's petition, along with the following parties:

First Tennessee Bank, NA
c/o Mark J. Sandlin
GOLDBERG SIMPSON
9301 Dayflower Street
Louisville, Kentucky 40059

Cardinal Health
Attn: Denene Bryd
7000 Cardinal Place
Dublin, Ohio 43017

SunTrust Bank
Attn: Cardinal Program Manager
303 Peachtree Street
2nd Floor, Mail Code 1802
Atlanta, Georgia 30308

John R. Tarter
Mapother & Mapother, P.S.C.
815 West Market Street, Suite 500
Louisville, Kentucky 40202-2654

                                            /s/ David M. Cantor
                                            DAVID M. CANTOR

G:\doc\DMC\Kentuckiana Medical Center, LLC\First Day Motions\Mot Borrow.wpd