UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| KENTUCKIANA MEDICAL CENTER, LLC | ) Chapter 11 |
| | ) |
| Debtor. | ) Case No. 10-93039-BHL-11 |
| | ) |

## MOTION TO CONVERT

The Official Committee of Unsecured Creditors (the "*Committee*") appointed in the above-captioned bankruptcy case of Kentuckiana Medical Center, LLC (the "*Debtor*"), by and through its undersigned counsel, hereby moves this Court (the "*Motion*") for entry of an order converting the Debtor's bankruptcy case to a proceeding under chapter 7 of title 11 of the United States Code (the "*Bankruptcy Code*"). In support of this Motion, the Committee respectfully states as follows:

### Introduction

1.      After nearly eight months in chapter 11, the basic fundamentals of the Debtor's exit plan remain an enigma. The Debtor has provided creditors and this Court with nothing more than vague details and unsubstantiated prospects of reorganization based on undocumented verbal commitments and discussions. Meanwhile, the Debtor's estate is bleeding money, no cash collateral budget has been filed to monitor the Debtor's spending, administrative costs continue to mount, negotiations with Rialto (the senior secured creditor in the bankruptcy case of KMC Real Estate Investors LLC ("*KMC REI*")) have stalled,[1] the Debtor has not provided a

---

[1]    KMC REI is the entity that owns the real property upon which the Debtor operates, and numerous principals of the Debtor are also principals of KMC REI. KMC REI filed a chapter 11 bankruptcy petition with this Court on April 1, 2011 (Case No. 11-90930-BHL-11).

CI-9203584 v3

meaningful update regarding the status of plan financing, no outline of a chapter 11 plan has been produced to the Committee (even though such outline has been requested), and no evidence of an "imminent" reorganization has been provided in the event that post-petition financing to KMC REI is approved and Rialto's lien is primed. In light of these issues, the Debtor's ability to propose a viable, confirmable plan of reorganization is highly unlikely.

2. The Committee was initially supportive of the Debtor's efforts to explore financing proposals and negotiate with secured creditors, believing that if the Debtor could maintain operations and ultimately confirm a plan, unsecured creditors might be able to achieve a meaningful recovery. Unfortunately, the Committee has not received anything to suggest that a successful reorganization – and a meaningful recovery for unsecured creditors – is either "imminent" or probable, and with the Debtor unable to even pay its administrative costs as they come due, conversion to a chapter 7 case appears to be appropriate.

3. Given the Debtor's bleak outlook, the Committee no longer believes that the Debtor can successfully reorganize. Accordingly, unless the Debtor can comply with the provisions of the following paragraph (or otherwise convince the Committee that conversion is not appropriate), the Committee believes that this Court should enter an order converting the Debtor's bankruptcy case to a proceeding under chapter 7 of the Bankruptcy Code.

4. If, however, the Debtor can provide concrete details regarding a viable, feasible, and confirmable plan reorganization *at least three business days prior to the hearing on this Motion* so that the Committee, this Court, and other parties in interest have ample opportunity to analyze such details, only then may it be appropriate to allow the Debtor to remain in chapter 11. These details must include, at a minimum:

    (a)    the specific price agreed upon between the Debtor, KMC REI, Rialto, and the plan lender regarding payment on account of Rialto's claim, with a

      signed, written statement acknowledging that all such parties accept those terms;

(b) the proposed treatment of Rialto's deficiency claim, if any, under a chapter 11 plan, with a signed, written statement acknowledging that all such parties accept those terms, and specifically noting that such deficiency claim will only be against KMC REI and not against the Debtor;

(c) a signed, written acknowledgement stating that the plan lender is prepared to provide substantial funding to pay off all administrative claims and provide a meaningful carve-out for general unsecured creditors, including the proposed amount of such funding to be specifically designated to the Debtor's estate and the amount to be set aside for general unsecured creditors;

(d) a signed, written acknowledgment from the Debtor showing that steps have been taken to ensure that any money carved out for general unsecured creditors would be meaningful, including actions such as conducting a claims analysis, discussing with the Debtor's principals that their claims will be waived in the context of a global settlement, and agreeing to waive all intercompany claims; and

(e) a specific timeline setting forth dates by which all of these actions, and other tasks necessary for confirmation, will occur.

In short, the Debtor must provide a clear roadmap of its proposed exit plan with signed, written acknowledgments as opposed to hollow representations. These requests are not premature in light of: (i) how long the Debtor has been in bankruptcy; (ii) the amount of work done (and fees incurred) to date by the Debtor's professionals, and (iii) the Debtor's representation in paragraph 13 of the *Debtor's Second Motion to Extend Exclusivity* that if KMC REI receives post-petition financing, "a successful reorganization of the Debtor herein will be not only possible, but imminent."

## Jurisdiction

5. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The statutory basis for the relief requested herein is section 1112(b) of title 11 of the United States Code (the "*Bankruptcy Code*").

## Background

**A.     General Case Background**

7.     On September 19, 2010, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its assets as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8.     On October 6, 2010, the Office of the United States Trustee appointed the Committee as an official committee to represent the interests of unsecured creditors of the Debtor pursuant to section 1102 of the Bankruptcy Code (Docket No. 68).

9.     On October 6, 2010, the Debtor filed an application to employ Vaco Resources and designate Timothy J. Donahue as Chief Restructuring Officer (Docket No. 72). An order granting such application was entered on October 7, 2010 (Docket No. 84).

**B.     Schedules, Statement of Financial Affairs, and Monthly Operating Reports**

10.    On October 22, 2010, the Debtor filed its Schedules and Statement of Financial Affairs listing approximately $9.5 million in assets, $15.5 million in secured debt, $81,000 in unsecured priority claims, and $9.4 million in unsecured nonpriority claims (Docket No. 131). On December 17, 2010, the Debtor filed an amended Schedule F adding approximately $35,000 in unsecured nonpriority claims (Docket No. 237). On March 10, 2011, the Debtor filed a second amended schedule F adding approximately $61,000 in unsecured nonpriority claims (Docket No. 386).

11.    The Debtor has filed monthly operating reports for September, October, November, December, January, February, and March. For those months, the Debtor's monthly operating reports indicate losses in each month in the following respective amounts: $714,924;

4

$806,401; $809,259; $821,739; $708,376; $772,221; and $764,268. By the Debtor's own accounting, this reflects a loss of $5,397,188 since the Petition Date.

C. **Failure to File Cash Collateral Budget**

12. On January 20, 2011, this Court held a hearing on, among other things, a motion to prohibit the Debtor's use of cash collateral. At such hearing, the Committee's counsel explained that it had a limited objection to the motion in that the Debtor should be required to file a cash collateral budget with the Court to allow the Committee and other parties in interest to monitor the Debtor's actions and spending. The Court agreed with the Committee, and cash collateral use was allowed based on the Debtor's representation that it would file a cash collateral budget. This was over three months ago.

13. After multiple correspondence between the Debtor and Committee,[2] and in spite of the Debtor's representation on the record that it would do so, it became apparent that the Debtor would be unwilling to voluntarily file a cash collateral budget. Without a filed budget which is regularly updated and provided to the Committee, the Committee is unable to effectively monitor the Debtor's actions to determine whether there will be ample funds available to confirm a plan of reorganization and pay all administrative expenses in connection with such plan. Accordingly, on April 20, 2011, the Committee filed its Motion to Compel.

D. **Motions to Extend Exclusivity**

14. On January 14, 2011, the Debtor filed its *Motion to Extend Exclusivity Periods for Filing and Soliciting Acceptances of a Plan of Reorganization* (Docket No. 275) (the "*First Motion to Extend*") seeking to extend its exclusive periods to file a plan and solicit acceptances

---

[2] The specifics of such correspondence are set forth in greater detail in the Committee's *Motion to Compel Filing of Cash Collateral Budget* filed on April 20, 2011 (Docket No. 435) (the "*Motion to Compel*").

5

thereon to April 18, 2011 and June 17, 2011 respectively. In the First Motion to Extend, the Debtor asserted that "KMC is continuing to generate revenues and to manage its property." The First Motion to Extend was approved by this Court on February 17, 2011 (Docket No. 343).

15. On April 13, 2011 the Debtor filed the *Second Motion to Extend Exclusivity Period* (Docket No. 425) (the "*Second Motion to Extend*") seeking to extend its exclusive period to file a plan to July 18, 2011. Among other things, paragraph 13 of the Second Motion to Extend provides that ". . . if Court approval of post-petition financing to KMC REI is approved, this bankruptcy estate will benefit such that a successful reorganization of the Debtor herein will not only be possible, but imminent." The Debtor also asserts in paragraph 6 of the Second Motion to Extend that "it has made significant progress in identifying and negotiating a handful of legitimate proposals from parties interested in injecting capital sufficient to fund a reorganization which could generate a meaningful recovery for creditors of this estate." The Committee has not received an update on any such "legitimate proposals" since February 22, 2011, even though the Committee sent an e-mail to Debtor's counsel on February 17, 2011 stating, among other things, "[g]oing forward, please provide the Committee with any term sheets or inquiries on a real time basis."

## Argument

16. This case no longer belongs in chapter 11. In the approximate eight months since the Petition Date, the Debtor has failed to show any reasonable likelihood of obtaining sufficient new capital to fund a feasible plan of reorganization. Administrative costs continue to mount, negotiations with Rialto appear to have reached a standstill, and the Debtor has failed to abide by its representation to this Court that it will file a cash collateral budget thus limiting the amount of monitoring that parties in interest have over the Debtor's spending and operations. The longer

6

the Debtor remains in chapter 11 incurring substantial costs, the less likely it is that unsecured creditors will receive a distribution.

17. Section 1112(b)(1) of the Bankruptcy Code provides that:

> after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1). Here, "cause" exists to convert the Debtor's case to chapter 7 pursuant to both section 1112(b)(4) of the Bankruptcy Code and the "good faith" standard applied by courts.

**A.    "Cause" Exists Under Section 1112(b)(4)(A)**

18. The term "cause" under section 1112(b)(4)(A) of the Bankruptcy Code includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1124(b)(4)(A).

19. The Debtor has admitted, both in representations to the Court and in its monthly operating reports, that the estate is losing money. From September 2010 through March 2011, the Debtor's monthly operating reports indicate losses in each month, ranging from its best month where the Debtor lost $708,376 to its worst month where the Debtor lost $821,739. By the Debtor's own accounting, the total loss from the Petition Date until March 31, 2011 was an astounding $5,397,188. Clearly, there is a "substantial and continuing loss to or diminution of the estate."

20. At the same time, the Debtor has not demonstrated a "reasonable likelihood of rehabilitation." As discussed above, the Debtor's estate is bleeding money, administrative costs continue to mount, negotiations with Rialto (the senior secured creditor in the bankruptcy case of

7

KMC REI have stalled, the Debtor has not provided a meaningful update regarding the status of plan financing, no outline of a chapter 11 plan has been produced to the Committee (even though such outline has been requested), and no evidence of an "imminent" reorganization has been provided in the event that post-petition financing to KMC REI is approved and Rialto's lien is primed. In light of these issues, the Debtor's ability to propose a viable, confirmable plan of reorganization is highly unlikely. Based on discussions with Debtor's counsel and other parties interest, there is simply no proposal out there that could come close to satisfying all of the administrative claims that have accrued, provide for a meaningful distribution to unsecured creditors, and that would meet the approval of Rialto.

21.     Indeed, during the pendency of this case, it appears that the Debtor's chances of reorganizing have actually worsened. Certainly the Debtor has not demonstrated a "reasonable likelihood of rehabilitation."

**B.      "Cause" May Exist Under Section 1112(b)(4)(D)**

22.     The term "cause" under section 1112(b)(4)(D) of the Bankruptcy Code includes "unauthorized use of cash collateral substantially harmful to 1 or more creditors." 11 U.S.C. § 1124(b)(4)(D).

23.     Based on the Debtor's continued disregard of its representation to this Court that it would file a cash collateral budget, as well as its blatant disregard of the Committee's repeated requests to review and monitor cash collateral use through a budget, it is difficult to tell whether "cause" exists under section 1112(b)(4)(D) to convert the Debtor's case.

24.     That said, the Committee believes that the Debtor is far exceeding the amounts budgeted for certain costs in this case, and similarly believes that the entity allowing cash collateral use (Hal-Robb) and/or its principals are personally satisfying certain of the Debtor's obligations through the additional, undocumented influx of cash. At this point, without fully

8

researching this issue, the Committee does not believe that there is a legal issue stemming from a third party satisfying debts of the Debtor; nor has the Committee conducted discovery to confirm these beliefs. Instead, the overarching concern – if such outside entity is satisfying the Debtor's obligations – is that the Debtor is unable to operate purely on cash collateral (as the Court and parties in interest have been led to believe that it has been doing).

25.     Moreover, the Committee is skeptical that the budget, to the extent one even exists, contains a line item to satisfy the amounts that the Debtor has been agreeing to pay in accordance with administrative expense claim disputes before this Court. For a Debtor with limited cash (the daily balance hovers around $200,000), it is unlikely that the cash collateral budget accounts for the significant payments that the Debtor has agreed to issue to, among other parties, DivLend Equipment Leasing. Accordingly, the Committee believes that the Debtor is not complying with any cash collateral budget, and is potentially using such cash collateral in an unauthorized manner to the detriment of the a majority of the Debtor's creditors.

C.    **The Debtor Has Not Acted In Good Faith**

26.     A court may convert a bankruptcy case for lack of good faith in order to prevent abuse of the chapter 11 process. Although section 1112(b)(4) of the Bankruptcy Code does not expressly authorize a court to convert a bankruptcy case for lack of good faith, courts have held that this requirement is an implicit condition to the filing and maintenance of a bankruptcy case. *See* 7 *Collier on Bankruptcy*, § 1112.07 at 1112-49 (15th ed. rev. 2009). Indeed, many Circuits (including the Seventh Circuit) have used lack of good faith as "cause" for relief under section 1112(b). *See In re Madison Hotel Assocs.*, 749 F.2d 410, 426 (7th Cir. 1984); *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999); *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994). Here, the Debtor is abusing the chapter 11 process by remaining in chapter 11 with no prospects of rehabilitation, incurring substantial administrative costs, refusing to file and

9

regularly update a cash collateral budget for parties in interest to monitor the Debtor's spending, and generally failing to acknowledge or even respond to the Committee's requests even though the Debtor has a duty to do so.

27.    The good faith standard focuses on the subjective intentions of the debtor, and is intended to prevent abuse of the bankruptcy process. *See, e.g., In re Victory Constr. Co., Inc.*, 9 B.R. 549, 559 (Bankr. C.D. Cal. 1981). While courts utilize a totality of circumstances analysis to determine the debtor's subjective intentions, lack of good faith has been found where there is an absence of any likelihood of rehabilitation.[3] The Debtor has no likelihood of rehabilitation. In its approximate eight months in chapter 11, the Debtor has not obtained new funding or provided any evidence that it will obtain sufficient capital to propose and confirm a viable plan of reorganization. Meanwhile, the Debtor continues to represent that a deal is close – a representation that is made monthly yet nothing has been accomplished, and nothing has been presented to this Court or to the Committee to indicate that any deal is "imminent." Accordingly, the Debtor's lack of good faith provides additional grounds for conversion of this chapter 11 case.

## Conclusion

28.    The Debtor cannot be allowed to remain in chapter 11. Administrative costs continue to mount, negotiations with Rialto appear to have reached a standstill, and the Debtor has failed to abide by its representation to this Court that it will file a cash collateral budget thus limiting the amount of monitoring that parties in interest have over the Debtor's spending and

---

[3]    *Fidelity Assurance Ass'n v. Sims*, 318 U.S. 608, 618 (1943) (good faith found to be lacking on the ground that no reorganization was "reasonably to be expected"); *C-TC 9th Avenue P'ship v. Norton Co. (In re C-TC 9th Avenue P'ship)*, 113 F.3d 1304, 1311-12 (2d Cir. 1997).

10

operations. The longer the Debtor remains in chapter 11 incurring substantial costs, the less likely it is that unsecured creditors will receive a distribution. Accordingly, the Debtor should no longer be permitted to remain in chapter 11 with no hopes of reorganizing, and this case should be converted to chapter 7.

WHEREFORE, the Committee respectfully requests that the Court enter an order (i) converting the Debtor's bankruptcy case to a case under chapter 7 of the Bankruptcy Code; and (ii) granting such other and further relief as the Court deems just and proper.

Dated: May 4, 2011

Respectfully submitted,

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF KENTUCKIANA MEDICAL CENTER LLC**

/s/  Jeffrey M. Heller
One of its Attorneys

Harley J. Goldstein
Matthew E. McClintock
Jeffrey M. Heller
70 West Madison Street, Suite 3100
Chicago, Illinois  60602
Telephone: (312) 372-1121
Facsimile:  (312) 827-8000

11

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was served via electronic and/or U.S. Mail this 4th day of May, 2011 upon all parties entitled to such notice as provided by the ECF filing system.

/s/  Jeffrey M. Heller