## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| KENTUCKIANA MEDICAL CENTER, LLC | ) | CHAPTER 11 |
| | ) | |
| Debtor | ) | CASE NO. 10-93039-BHL-11 |
| | ) | |

## DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT
## DATED JANUARY 16, 2012

Respectfully submitted,

/s/ David M. Cantor
DAVID M. CANTOR
NEIL C. BORDY
CHARITY B. NEUKOMM
TYLER R. YEAGER
SEILLER WATERMAN LLC
Meidinger Tower, 22nd Floor
462 South 4th Street
Louisville, Kentucky 40202
Telephone: (502) 584-7400
Facsimile: (502) 583-2100
E-mail: cantor@derbycitylaw.com
E-mail: bordy@derbycitylaw.com
*Counsel for Kentuckiana Medical Center, LLC*

I.    **INTRODUCTION**

This is the first amended disclosure statement (the "<u>Disclosure Statement</u>") in the chapter 11 case of Kentuckiana Medical Center, LLC ("<u>KMC</u>," or alternatively referred to herein as "<u>Debtor</u>" and "<u>Plan Proponent</u>") which was commenced on September 19, 2010 (the "<u>Petition Date</u>"). This Disclosure Statement contains information about the Debtor and describes its First Amended Plan of Reorganization (the "<u>Plan</u>") filed on January 16, 2012. A full copy of the Plan accompanies this Disclosure Statement and is incorporated herein by reference.

***Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. You are further encouraged to read the disclosure statement and plan submitted by KMC Real Estate Investors, LLC in case no. 11-90930 for additional information regarding the restructuring described herein. If you do not have an attorney, you may wish to consult one.***

The proposed distributions under the Plan are discussed at pages 10 – 17 of this Disclosure Statement.  The Plan classifies claims of general unsecured creditors in Class 3, and contemplates partial repayment of said claims through *pro rata* cash distributions from the Debtor's Available Cash on the later of (i) the date that is sixty (60) days after the Effective Date of the Plan or (ii) the Date that all Disputed Claims have been resolved by Final Order(s).

A.    **Purpose of this Disclosure Statement**

This Disclosure Statement describes:

- the Debtor and significant events during the bankruptcy case;

- how the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you can expect to receive on your claim or equity interest if the plan is confirmed);

- who may vote on and/or object to the Plan;

- what factors the Bankruptcy Court will consider when deciding whether to confirm the Plan;

- why the Debtor believes the  Plan is feasible;

- how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation; and

- the effect of confirmation of the Plan.

It is important to read the Plan as well as the Disclosure Statement.  This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

B.    **Disclaimers**

No person is authorized by the Debtor in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized by the Debtor. Although the Debtor will make available to creditors entitled to vote on the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

The information contained in this Disclosure Statement, including the information regarding the history, business and operations of the Debtor, the financial information regarding the Debtor and the liquidation analysis relating to the Debtor, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

**All creditors are encouraged to read and carefully consider this Disclosure Statement, including the Risk Factors described under Section III.E, and the Plan prior to submitting ballots in response to this solicitation.**

C.      **Important Deadlines; Date of Confirmation Hearing**

If the Bankruptcy Court determines that this Disclosure Statement contains adequate information, the Order Approving this Disclosure Statement will contain important information concerning the dates by which you may vote on and/or object to confirmation of the Plan. By separate motion filed concurrently herewith, the Debtor has asked the Court to reschedule the hearing on approval of this Disclosure Statement to February 14, 2012.

The Bankruptcy Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1.      *Time and Place of the Hearing to Confirm the Plan*

The hearings at which the Bankruptcy Court will determine whether to confirm the Plan will take place in Room 103, Federal Building, 121 West Spring Street, New Albany, Indiana 47150, at a date and time to be determined by the Bankruptcy Court and published pursuant the provisions of the first paragraph of this Section I.C.

2.      *Voting to Accept or Reject the Plan*

See Section IV.A below to determine whether you may be eligible to vote on the Plan.

If you are entitled to vote to accept or reject the Plan, indicate your vote on the ballot provided to you by Debtor's counsel and return the ballot via one (1) of the following methods:

If by Regular U.S. Mail:
 Seiller Waterman LLC
 Attn:  Rebecca Elliott
 462 South Fourth Street, 22nd Fl.
 Louisville, Kentucky  40202


If by Facsimile:
 (502) 371-9253


If by Electronic Mail:
 belliott@derbycitylaw.com
 Subject:  10-93039 Kentuckiana Medical Center, LLC ballot

   Your ballot must be received by the Voting Deadline (as described in the Order Approving the Disclosure Statement or other Bankruptcy Court Order) or it will not be counted.

   3. *Deadlines for Objecting to the Adequacy of Disclosure and Confirmation of the Plan*

   Objections to approval of this Disclosure Statement or to the confirmation of the Plan must be filed with the Bankruptcy Court and served upon counsel for the Debtor and the Office of the United States Trustee by the respective Objection Deadlines (as described in the Order Approving the Disclosure Statement or other Bankruptcy Court Order).

   4. *Identity of Person to Contact for More Information*

   If you want additional information about the Plan, you should contact counsel for the Debtor via the contact information below:

   David M. Cantor
   Neil C. Bordy
   Seiller Waterman LLC
   462 South 4th Street, 22nd Floor
   Louisville, Kentucky  40202
   Telephone: (502) 584-7400
   Electronic mail: cantor@derbycitylaw.com
   Electronic mail: bordy@derbycitylaw.com
   Facsimile: (502) 583-2100


## II. BACKGROUND

### A. Description and History of the Debtor's Business

   The Debtor is a limited liability company organized under the laws of the State of Indiana engaged in the operation of a for-profit acute care medical facility located in Clarksville, Indiana (the "Hospital"). KMC offers a range of care including cardiovascular, oncology, urology, internal medicine and plastics within its planned 60-bed facility. KMC typically employs approximately 200 individuals at the Hospital.

4

The Hospital serves the Louisville metropolitan market with its primary focus on the six (6) Indiana counties immediately across the Ohio River from Louisville. The majority of KMC's patients have been referred to the Hospital through the physician investors, with others being sent by non-equity physicians in the region who have privileges at the Hospital.

B.    **Insiders of the Debtor**

The Debtor's Board of Managers (the "Board") consists of the following individuals:

| Name | Title | Affiliation |
|------|-------|-------------|
| Dr. Christodulos Stavens | Chief Executive Officer | 12.37% owner of KI, Manager |
| Dr. Jeffrey Campbell | Board Member | 5.15% owner of KI |
| Dr. Eli Hallal | Board Member | 14.43% owner of KI |
| Dr. Renato LaRocca | Board Member | 2.58% owner of KI |
| Dr. Badr Idbeis | Board Member | CHA, President and CEO |
| David Phillips | Board Member | CHA |
| Derrick Idbeis | Secretary | CHA |

The equity membership interests in the Debtor are held in part (49%) by Cardiovascular Hospitals of America, LLC ("CHA"), in part (49%) by Kentuckiana Investors, LLC ("KI"), and in part (2%) by Larry and Leslie Robertson. CHA is a Delaware limited liability company in the business of developing, owning and managing for-profit hospitals. CHA specializes in establishing joint-venture ownership of hospitals between itself and private investors, typically practicing physicians. KI is a Delaware limited liability company whose membership interests are held by thirty (30) physicians who practice in the greater Louisville, Kentucky area. At the Debtor's inception, it was anticipated that the physician-investors who comprised KI would regularly admit patients to the Hospital and perform surgeries, exams and other necessary procedures on-site. The membership interests of KI are distributed as follows:

| Doctor | Membership Interest | Specialty | Primary Office |
|--------|---------------------|-----------|----------------|
| George L. Alcorn | 5.15% | Internal Medicine | Madison, IN |
| David Berry | 2.06% | Family Medicine | Louisville, KY |
| David Britt | 1.37% | Internal Medicine | Louisville, KY |
| Abdul G. Buridi | 1.03% | Nephrology | Louisville, KY |
| Jeffrey Campbell | 5.15% | Family Medicine | Jeffersonville, IN |
| Keith B. Carter | 1.37% | Internal Medicine | Louisville, KY |
| Mary Lynell Chamberlain | 0.21% | Pulmonary | Louisville, KY |
| Alexander G. Digenis | 2.06% | Plastic Surgery | Louisville, KY |
| Thomas Eckert | 2.06% | Internal Medicine | Madison, IN |
| Eugene Giles | 3.09% | Family Medicine | Louisville, KY |
| Shawn Glisson | 2.58% | Oncology | Louisville, KY |
| Eli R. Hallal | 14.43% | Family Medicine | New Albany, IN |
| Amy Hallal-Henderson | 1.03% | Family Medicine | New Albany, IN |
| John E. Hategan | 2.06% | Family Medicine | Salem, IN |
| Samer H. Hussein | 2.06% | Family Medicine | Carrolton, KY |
| Robert Karman | 3.30% | Pulmonary | Louisville, KY |
| Zaka Khan | 0.21% | Pulmonary | Louisville, KY |
| Renato LaRocca | 2.58% | Oncology | Louisville, KY |
| John W. McConnell | 2.27% | Pulmonary | Louisville, KY |
| Julio Melo | 4.12% | Infectious Disease | Louisville, KY |
| Charles Oates | 3.09% | Neurology | Louisville, KY |
| Brian J. Paradowski | 1.37% | Internal Medicine | Louisville, KY |

| R. Rahman | 1.03% | Internal Medicine | Jeffersonville, IN |
|---|---|---|---|
| Denis P. Raleigh | 5.15% | Cardiothoracic Surgery | Louisville, KY |
| Syed T. Raza Kaqvi | 1.03% | Cardiologist | New Albany, IN |
| Lawrence R. Rouben | 3.09% | Pulmonary | Clarksville, IN |
| John D. Rumisek | 5.15% | Cardiothoracic Surgery | Louisville, KY |
| Warren Shaikun | 0.21% | Pulmonary | Louisville, KY |
| Anil K. Sharma | 1.03% | Cardiologist | Louisville, KY |
| Christodulos Stavens | 12.37% | Cardiologist | Louisville, KY |
| Mio M. Stikovac | 5.15% | Cardiologist | Louisville, KY |
| Leslie Strouse-Mattingly | 1.03% | Family Medicine | New Albany, IN |
| Brian Thornton | 2.06% | Plastic Surgery | Louisville, KY |

In addition to the above-described holders of equity interests in the Debtor and its affiliates, the non-owner insiders of the Debtor are its Chief Financial Officer, Nicholas R. Clark, its Chief Operating Officer, Paul Newsom, and KMC Real Estate Investors, LLC ("KMCREI"). KMCREI owns the approximately 10-acre campus on which the Hospital is situated, and is owned in part (89.5%) by KI and in part (10.5%) by CHA.

The Debtor's current management has earned and received normal, market-rate compensation and benefits packages in the periods both prior to and following the Petition Date, commensurate with the performance of their respective duties as officers of the Debtors.

## C.    Events Leading to Chapter 11 Filing

The concept for a Louisville-area physician-owned hospital that would eventually become KMC began to take shape as early as 2005. Dr. Stavens and CHA located investors for the project, and necessary financing was obtained first for the real estate, in 2007 ($21,500,000.00), and secondly for operating capital in 2009 ($6,875,000.00). The Hospital opened on August 7, 2009, and began operating ten (10) beds, three (3) operating rooms and one (1) catheterization laboratory. From the outset the configuration was functional yet well short of completion, but KMC had to open its doors prior to completion of the Hospital or it could have lost important state medical licenses and its eligibility to function as a physician-owned hospital. At first, KMC did not have contracts with any major insurance companies in the area nor had it acquired a Medicare provider number. KMC received its Medicare number on September 18, 2009, and had finalized its contracts with insurance companies by January 2010. Prior to that point, the Hospital was being operated at a substantial loss and without the security of regular payments for the Debtor's medical services.

Even as KMC's operational capacity increased and reimbursements from third-party providers became more consistent, the Debtor's financial performance remained inadequate to service its debt. To attempt to remedy persistent operational inefficiencies, KMC engaged two financial consulting firms to assess the Hospital and suggest improvements, yet struggled to implement effective strategies to improve operations. The continued shortfall was not for lack of effort on behalf of KMC or its management, but primarily due to KMC's inability to procure additional capital necessary to address the Hospital's fundamental flaw – that significant portions of the Hospital, particularly the planned emergency room, additional operating rooms and patient rooms, remained unfinished and therefore unable to generate the patient revenues necessary for KMC to maintain positive cash flow.

As a result of KMC's inability to fully service its debt obligations, its primary secured creditor, First Tennessee Bank, N.A. ("FTB") initiated a freeze on KMC's operating account maintained at FTB on September 8, 2010. Subsequent to the freeze, FTB honored checks written prior to September 8,

6

2010, and permitted wire transfers for the purchase of needed pharmaceutical products, but informed the Debtor that all checks issued after the freeze date would require prior authorization. Prior to the Petition Date, FTB did not approve any checks written on or after the date of the freeze. In addition to freezing KMC's main operating account, FTB continued to sweep deposited funds out of KMC's account on September 13, 2010 and through the Petition Date. In order to regain control of its operating cash so that the Hospital's patients could receive necessary care and employees could be paid, KMC identified commencement of this bankruptcy case as its only viable option.

### D.    Significant Events During the Bankruptcy Case

#### 1.    *Automatic Stay*

An immediate effect of the filing of the Debtor's chapter 11 petition was the imposition of the automatic stay under § 362(a) of the Bankruptcy Code which enjoined, with limited exceptions, the commencement or continuation of the enforcement of liens against the Debtor's property, the continuation of litigation against the Debtor and any other collection efforts by creditors. This relief afforded the Debtor the "breathing spell" necessary to assess and reorganize its business. The automatic stay remains in effect, unless modified by the Bankruptcy Court or applicable law, until the Effective Date.

#### 2.    *Use of Cash Collateral*

As of the Petition Date, all of the Debtor's operating cash had been pledged as security for the payment obligations of the Debtor arising under the pre-petition indebtedness owed to FTB. In addition thereto, Cardinal Health, Inc. and its subsidiaries (collectively, "Cardinal Health") claimed a perfected purchase money security interest in certain inventory of the Debtor, primarily pharmacological supplies. Thus, all of the Debtors' cash, accounts receivable, inventory and proceeds constituted cash collateral of FTB and Cardinal Health (the "Cash Collateral"). The Debtor initially obtained temporary authorization to use the Cash Collateral through an Interim Order Authorizing Debtor's Post-Petition Use of Cash Collateral entered by the Bankruptcy Court on September 24, 2010 (the "Interim Cash Collateral Order"). The terms of the Interim Cash Collateral Order were extended by the Bankruptcy Court's continued approval of the Debtor's use of Cash Collateral in the ordinary course of its business, subject to the granting of replacement liens in the Debtor's post-petition cash, inventory and accounts receivable. FTB continued to object to the Debtor's use of Cash Collateral until its claim against the Debtor and interest in the Cash Collateral was purchased by Hall Robb, LLC ("Hall Robb"). At all times herein, Hall Robb has consented to the Debtor's continued use of Cash Collateral subject to the Bankruptcy Court's grant of continuing replacement liens in the post-petition assets of the Debtor.

The Debtor's ability to use the Cash Collateral during the pendency of this chapter 11 case has been vital to the Debtor's sustained ability to maintain normal business operations and restructure as contemplated by the Plan.

#### 3.    *Appointment of Chief Restructuring Officer*

At the outset of the Debtor's chapter 11 case, the Board recognized that many of KMC's creditors and equity interest holders had lost confidence in those managing and controlling the Hospital's business operations. In addition to maintaining levels of support from interested parties

necessary to keep the reorganization effort viable, the local doctors who shared KMC management duties acknowledged that KMC and its creditors would be better served if they focused their time and talents on redoubling their efforts to increase patient admissions and the Hospital's overall profitability.

Thus, on October 7, 2010, the Bankruptcy Court entered an order approving the bankruptcy estate's retention and employment of Vaco Arizona, LLC, by and through its agent Timothy J. Donahue, as Chief Restructuring Officer (the "CRO") for KMC. As CRO, Mr. Donahue was empowered, among other duties, to supervise the Hospital's business operations, negotiate with creditors and other business partners on behalf of the Debtor, and evaluate the continued viability of the Debtor's reorganization. Since his appointment as CRO, Mr. Donahue has coordinated with the Board on exploring the Debtor's post-petition financing opportunities and developing the Plan.

4.    *Retention of Property*

Much of the equipment utilized in operation of the Hospital was pledged, prior to the Petition Date, as collateral to vendors or financers who furnished KMC with money to acquire equipment. During the pendency of this chapter 11 case, the Debtor has retained possession of those capital assets that are subject to creditors' security interests. In order to compensate those secured creditors affected by imposition of the automatic stay and pursuant to Bankruptcy Court orders, the Debtor has made regular cash payments to creditors as adequate protection for KMC's continued use and possession of collateral (the "Adequate Protection Payments"). The Debtor's retention of its property throughout this chapter 11 case has preserved the going concern value of the Hospital, and Debtor submits that its Adequate Protection Payments have effectively neutralized any harm that any of the respective lienholders may have complained of due to the automatic stay.

5.    *Extension of Exclusivity Period*

From time to time throughout the pendency of this chapter 11 case, the Debtor requested and received from the Bankruptcy Court orders preserving its exclusive right to propose and solicit votes accepting a chapter 11 plan.  The period in which the Debtor had an exclusive right to propose and solicit votes on a plan expired on July 30, 2011.

6.    *KMCREI's Bankruptcy*

On April 1, 2011, KMCREI filed with the Bankruptcy Court its voluntary petition for relief under chapter 11 of the Bankruptcy Code (Case No. 11-90930-BHL-11). KMCREI's bankruptcy filing was precipitated by the foreclosure proceedings of RL BB Financial, LLC ("Rialto") as the first mortgagee of the premises on which the Hospital is located. KMCREI has been unable to meet its financial obligations to its mortgagee due to the Debtor's inability to pay rent to KMCREI. For additional information regarding KMCREI's assets, liabilities, operations and the status of its chapter 11 bankruptcy case, parties should refer to the Bankruptcy Court's record in Case No. 11-90930-BHL-11, available to the public from the Bankruptcy Court website located at www.insb.uscourts.gov (PACER registration and certain fees may apply).

7.    *Solicitation of New Capital*

Because the Debtor's poor financial performance to date is primarily attributable to the lack of a finished emergency room and other structural improvements (see Section II.C, *supra*), the

8

Debtor and KMCREI have determined that a joint effort for solicitation of a new capital investment in the Hospital is necessary to achieve financial performance that will enable both companies to achieve positive cash flows and service their debts as they come due. The affiliated debtors have thus marketed their assets and earning capacities as a "package deal" to parties who may be interested in and capable of financing the capital improvements in the Hospital. Based on the CRO's estimation that the structural improvements to the Hospital premises will require approximately $5 million to complete, the Debtor and KMCREI set out to negotiate financial accommodations with multiple interested parties for an infusion of capital that would enable the Hospital completion projects to begin immediately while also providing the Debtor sufficient funding to satisfy its existing debt obligations through a plan of reorganization. After months of solicitation and negotiations, the Debtor and KMCREI have identified an exit financing arrangement which they believe will enable the Hospital to achieve profitability and provide a meaningful recovery to creditors of the Debtor and KMCREI.

E.    **Projected Recovery of Avoidable Transfers**

The Debtor has reviewed its financial records and accounts in light of its powers and duties as a debtor in possession. Based on its review of its records and advice of counsel, at this time the Debtor does not intend to pursue, but does not waive, any preference, fraudulent conveyance, or other avoidance actions at this time.

F.    **Claims Objections**

Those claims which the Debtor disputes its liability, either in whole or in part, are identified in **Exhibit A**. Except to the extent that a claim is already an Allowed Claim pursuant to a Final Order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article VI of the Plan.

G.    **Current and Historical Financial Conditions**

The identity and current fair market value of the estate's and KMCREI's assets are listed in **Exhibit B**. The values listed in Exhibit B are based upon the data available in the Debtor's pre-petition financial statements, bankruptcy schedules and most recent monthly operating report.

A summary of the Debtor's operations for the 2011 calendar year is set forth in **Exhibit C**.

III.    **SUMMARY OF THE PLAN OF REORGANIZATION**

A.    **Purpose of the Plan of Reorganization**

As required by the Bankruptcy Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

B.    **Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Bankruptcy Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code. As such, the Plan Proponent has *not* placed the following claims in any class:

1.    *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 503(b) of the Bankruptcy Code and entitled to priority under § 507(a)(2) of the Bankruptcy Code. Administrative expenses also include claims allowed by Final Order (after notice and a hearing) for the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Bankruptcy Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following table lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:[1]

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | $1,702,526.35 | Paid in full on the Effective Date of the Plan, or according to terms of obligation if later |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | $10,571.11 | Paid in full on the Effective Date of the Plan, or according to terms of obligation if later |
| Professional Fees, as approved, or to be approved, by the Bankruptcy Court | $325,000.00 | Paid in full on the Effective Date of the Plan, or according to separate written agreement, or according to court order if such fees have not been approved by the Bankruptcy Court on the Effective Date of the Plan |
| Expenses deemed to have been actual and necessary to preservation of the estate | $1,447,099.22 | Paid in full on the Effective Date of the Plan, or according to separate written agreement. |
| Clerk's Office Fees | [NONE] | Paid in full on the Effective Date of the Plan |
| Other administrative expenses | [NONE] | Paid in full on the Effective Date of the Plan or according to separate written agreement |
| Office of the U.S. Trustee Fees | $15,000.00 | Paid in full on the Effective Date of the Plan |
| TOTAL | $3,500,196.68 | |

2.    *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Bankruptcy Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees

---

[1] The claims which the Plan and Debtor will treat as Allowed administrative expense Claims are identified in **Exhibit D**.

otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding five (5) years from the order for relief. As of the date the Plan has been proposed, there are no known priority tax claims asserted against the Debtor.

### C.    Classes of Claims and Interests

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

### 1.    *Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in classes. The Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment.

As of the Date this Plan is proposed, there are no known holders of Allowed Class 1 Claims. To the extent that a Final Order provides that one or more Allowed Claim(s) is entitled to priority treatment under §§ 507(a)(1), (4), (5), (6), and/or (7) of the Bankruptcy Code, said Allowed Claim(s) will be paid in full in cash on the Effective Date or according to Final Order.

### 2.    *Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate to the extent allowed as secured claims under § 506 of the Bankruptcy Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim unless specifically otherwise provided in the Plan.

The following table identifies all classes containing holders of Allowed secured prepetition Claims against the Debtor and their proposed treatment under the Plan:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 2-A | *Secured Claim of*: Hall Robb<br><br>*Collateral*: All of the Debtor's property and assets, whether now existing or hereafter acquired (the "Hall Robb Collateral").<br><br>*Priority of Lien*: First priority, except as to personal property subject to a valid purchase money security interest; second priority as to property encumbered by valid purchase money security interests.<br><br>*Total Claim*: $5,127,596.00<br><br>*Allowed Secured Claim*: $5,127,596.00<br><br>*Allowed Unsecured Amount*: $0.00 | Impaired | Upon the Effective Date, Hall Robb will receive $3,400,000.00 in cash as full satisfaction of its Secured Claim. Upon receipt of the cash payment, Hall Robb's security interests in the Hall Robb Collateral shall be forever released and discharged. |

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 2-B | *Secured Claim of:* Cardinal Health<br><br>*Collateral:* All inventory, including but not limited to, prescription and over-the counter pharmaceutical products, nutritional supplements, first-aid, health and beauty products, home health care equipment and products, general merchandise, sundries and any other products supplied by Cardinal Health of any kind whatsoever and wherever located, and whether now owned or hereafter acquired, and all products and proceeds thereof and any additions to, substitutions for, and replacements of any of the foregoing (collectively the "<u>Cardinal Health Supplied Collateral</u>").<br><br>All other inventory, in addition to the Cardinal Health Supplied Collateral, including but not limited to, prescriptions and over-the-counter pharmaceutical products, home health care products and general merchandise and supplies; all accessions and additions to, substitutions for, and replacements of any of the foregoing; all proceeds or products of any of the foregoing; and all rights to payment under any insurance or warranty, guaranty, or indemnity payable with respect to any of the foregoing (collectively the "<u>Other Creditor Supplied Cardinal Health Collateral</u>") (the Cardinal Health Supplied Collateral and the Other Creditor Supplied Cardinal Health Collateral shall herein after be referred to collectively as the "<u>Cardinal Health Collateral</u>").<br><br>*Priority of Lien*: First priority as to Cardinal Health Supplied Collateral; third priority as to Other Creditor Supplied Cardinal Health Collateral.<br><br>*Total Claim*: $679,170.39<br><br>*Allowed Secured Amount*: $220,000.00<br><br>*Allowed Unsecured Amount*: $499,170.39 | Impaired | Upon the Effective Date, Cardinal Health will receive $220,000.00 cash in full satisfaction of its Secured Claim. Upon receipt of the cash payment, Cardinal Health's security interests in the Cardinal Health Collateral shall be forever released and discharged. |

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 2-C | *Secured Claim of*: STERIS Corp. ("STERIS")<br><br>*Collateral*: Various operating room and anesthesiology equipment purchased from Steris and more specifically referenced in that certain UCC financing statement of record with the Indiana Secretary of State, File Number 200900000072343 (the "STERIS Collateral").<br><br>*Priority of Lien*: First (purchase money)<br><br>*Total claim*: $578,610.22<br><br>*Allowed Secured Amount*: $240,000.00<br><br>*Allowed Unsecured Amount*: $338,610.22, less amounts paid or agreed to be paid to STERIS by the Debtor or any guarantor(s) of the STERIS claim since the Petition Date. | Impaired | Upon the Effective Date, STERIS will receive $240,000.00 cash, less amounts paid between the date hereof and the Effective Date, in full satisfaction of its Secured Claim. Upon receipt of the cash payment, STERIS' security interests in the STERIS Collateral shall be forever released and discharged.<br><br>Nothing in this Disclosure Statement, the Plan or the Confirmation Order shall be interpreted to alter or impair STERIS' rights to enforce any settlement agreement entered into with one or more guarantors of the Debtor's indebtedness to STERIS. |

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 2-D | *Secured Claim of*: The Leasing Group Pool II, LLC ("Leasing Group")<br><br>*Collateral*: Various operating equipment purchased from third parties and more specifically referenced in those certain UCC financing statements of record with the Indiana Secretary of State, File Numbers 200900005228745, 200900005229221, and 200900007105327 (the "Leasing Group Collateral").<br><br>*Priority of Lien:* First (purchase money)<br><br>*Total Claim*: $2,787,256.40<br><br>*Allowed Secured Amount*: $2,787,256.40, less post-petition principal payments received from Debtor and/or third parties<br><br>*Allowed Unsecured Amount*: $0.00 | Impaired | **If Leasing Group votes to accept the Plan:**<br><br>*Initial Payment*: $250,000.00 cash on the Effective Date.<br><br>*Payment/Frequency*: $39,500.00 per month.<br><br>*Monthly Payments Begin*: Thirty (30) days after the Effective Date.<br><br>*Maturity Date*: the date that is eighty-four (84) months after the Effective Date.<br><br>*Interest Rate*: 6.00%<br><br>*Treatment of Lien*: Retained until all amounts due Leasing Group have been paid in full.<br><br>*Additional Provisions*: Debtor will make adequate protection payments of $20,000.00 per month until the Effective Date.<br><br>**If Leasing Group does not vote to accept the Plan:**<br><br>*Payment/Frequency*: $42,000.00 per month.<br><br>*Monthly Payments Begin*: Effective Date<br><br>*Maturity Date*: the date that is eighty-four (84) months after the Effective Date.<br><br>*Interest Rate*: 6.00%<br><br>*Treatment of Lien*: Retained until all amounts due Leasing Group have been paid in full.<br><br>*Additional Provisions*: Debtor will make adequate protection payments of $20,000.00 per month until the Effective Date. |

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 2-E | *Secured Claim of*: Taft Stettinius & Hollister LLP ("<u>Taft</u>")<br><br>*Collateral*: $57,981.24 in Taft's IOLTA account<br><br>*Priority of Lien:* Not applicable<br><br>*Total Claim*: $110,613.70<br><br>*Allowed Secured Amount*: $0.00<br><br>*Allowed Unsecured Amount*: $52,632.46 (after setoff of funds in IOLTA account) | Impaired | Taft claims a lien that is avoidable pursuant to 11 U.S.C. § 544. To the extent Taft remains unpaid after exercising any right of setoff that may exist, the allowed unsecured claim shall be paid as provided in Class 4. |
| 2-F | *Secured Claim of*: IPFS Corporation d/b/a Imperial Credit Corporation f/k/a Premium Financing Specialist as successor to AICCO, Inc. ("<u>ICC</u>")<br><br>*Collateral*: Insurance Return Premiums related to policies financed by ICC.<br><br>*Priority of Lien*: First<br><br>*Total Claim*: $103,269.93, less amounts paid to ICC since the Petition Date as approved by Orders of the Bankruptcy Court [Document Nos. 246 and 267].<br><br>*Allowed Secured Amount*: $103,269.93<br><br>*Allowed Unsecured Amount*: $0.00 | Unimpaired | Debtor will continue to make monthly payments to ICC per the parties' agreements and the Bankruptcy Court Orders authorizing such payments until ICC's claims are paid in full pursuant to the terms of said agreements and Orders. |

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 2-G | *Secured Claim of*: Med One Capital Funding, LLC ("Med One")<br><br>*Collateral*: Personal property described in and provided by Med One pursuant to an equipment lease agreement, including certain hospital beds, stretchers and other goods (the "Med One Collateral").<br><br>*Priority of Lien*: First (purchase money)<br><br>*Total Claim*: $1,471,186.26<br><br>*Allowed Secured Amount*: $1,471,186.26, less post-petition principal payments received from Debtor and/or third parties<br><br>*Allowed Unsecured Amount*: $0.00 | Impaired | **If Med One votes to accept the Plan:**<br><br>*Initial Payment*: $125,000.00 cash on the Effective Date.<br><br>*Payment/Frequency*: $21,500.00 per month.<br><br>*Monthly Payments Begin*: Thirty (30) days after the Effective Date.<br><br>*Maturity Date*: the date that is eighty-four (84) months after the Effective Date.<br><br>*Interest Rate*: 6.00%<br><br>*Treatment of Lien*: Retained until all amounts due Med One have been paid in full.<br><br>*Additional Provisions*: Debtor will make adequate protection payments of $10,000.00 per month until the Effective Date.<br><br>**If Med One does not vote to accept the Plan:**<br><br>*Payment/Frequency*: $23,000.00 per month.<br><br>*Monthly Payments Begin*: Effective Date<br><br>*Maturity Date*: the date that is eighty-four (84) months after the Effective Date.<br><br>*Interest Rate*: 6.00%<br><br>*Treatment of Lien*: Retained until all amounts due Med One have been paid in full.<br><br>*Additional Provisions*: Debtor will make adequate protection payments of $10,000.00 per month until the Effective Date. |

3. *General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Bankruptcy Code.

The following table identifies the proposed treatment of Allowed general unsecured Claims against the Debtor under the Plan:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 3 | Allowed Unsecured Claims not entitled to priority.<br><br>Estimated amount of Allowed Class 3 Claims: $6,000,000.00 | Impaired | On the date that is sixty (60) days after the Effective Date, the Debtor will distribute a one-time cash payment to each holder of a Class 4 Allowed Claim representing that holder's *pro rata* share of the Available Cash.<br><br>Debtor estimates that the Available Cash will be approximately $500,000.00. |

4. *Equity Interests*

Holders of equity interests are parties who have an ownership interest (*i.e.*, equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company ("LLC"), the equity interest holders are the members.

The following table identifies proposed treatment of the class of equity interest holders under the Plan:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 4 | Membership Interests in the Debtor | Impaired | Holders of Class 4 Interests shall have their membership interests canceled on or before the Effective Date. |

**D.    Means of Implementing the Plan**

1. *Source of Payments*

The Debtor's ability to fund the Plan is premised on the Debtor's and KMCREI's ability to obtain exit financing, as co-makers, from a willing lender (the "Exit Lender") in the anticipated principal amount of $37,000,000.00 (the "Exit Loan"). In addition to the $37,000,000.00 loan, the Debtor will obtain capital contributions from practicing physicians in the greater-Louisville area in the cumulative value of at least $3,854,000.00 (the "Post-Confirmation Investment"). The $40,854,000.00 is believed to be sufficient to allow KMC to continue to operate the Hospital and manage its assets.

2.    *Use of Funds*

The proceeds of the Exit Loan and the Post-Confirmation Investment will be utilized to satisfy the mortgage on KMCREI's real estate, fund necessary capital investments in improvements to the Hospital, pay the Claims treated in the Plan and establish cash reserves sufficient to ensure the Debtor's and KMCREI's ability to pay certain Post-Confirmation tax and secured debt obligations which may accrue while the structural improvements to the Hospital are being implemented. The Debtor's and KMCREI's anticipated use of the funds made available pursuant to the Exit Loan and the Post-Confirmation Investment is more particularly described in the Proposed Use of Funds Statement attached hereto as **Exhibit E** (the "Use of Funds Statement"). The amounts and payees identified in the Use of Funds Statement, and the transactions described in this Section III.D are projections and estimations based on the Debtor's and KMCREI's negotiations with parties involved in the procurement of the Exit Loan, and remain subject to change as may be required to obtain loan approval from the Exit Lender and/or consummate the Plan.

3.    *Argenta as Exit Lender*

The Debtor and KMCREI have negotiated with Argenta Group LLC d/b/a Argenta Financial ("Argenta") to function as the Exit Lender. Argenta has established the parameters of the restructuring transactions for which it is willing to provide financing, and Debtor believes that it can meet Argenta's requirements. To date, Argenta has preliminarily approved the Debtor for the proposed restructuring. Correspondence from Argenta evidencing the Debtor's credit pre-approval is attached hereto as **Exhibit F.** Upon final approval of credit terms approved and agreed to by Argenta, the Exit Loan will be offered to the Debtor and KMCREI, as co-obligors, subject to the approval of the Bankruptcy Court.

4.    *Exit Loan Proceeds Applied to KMCREI Real Estate*

As suggested in the Use of Funds Statement, $16,000,000.00 of the Exit Loan, plus an additional amount necessary to satisfy all outstanding property tax assessments, will be disbursed in order for Argenta to acquire title to the real estate owned by KMCREI(the KMCREI Real Property"). Said payment will be structured in accordance with, and subject to the Bankruptcy Court's approval under, § 363 of the Bankruptcy Code, such that Argenta obtains title to the KMCREI Real Property free and clear of any liens, claims or encumbrances. The KMCREI Real Property will revert to KMCREI upon payment of all amounts outstanding under the Exit Loan. In addition thereto, an additional $5,000,000.00 of the Exit Loan proceeds will be utilized in the construction projects and acquisition of new equipment to render the Hospital complete according to the initial plans and specifications (as modified by the CRO and Hospital management), as more fully set forth in the Capital Expenditure detail package attached hereto as **Exhibit G**.

5.    *Lease Transactions*

Upon Argenta's acquisition of title to the KMCREI Real Property, KMCREI and the Debtor will acquire leasehold interests in the KMCREI Real Property under one of two scenarios: (i) Argenta will lease the KMCREI Real Property to the Town of Clarksville ("Clarksville") pursuant to a "Hell-or-High-Water" master lease agreement (the "Master Lease Agreement");[2] Clarksville will

---

[2] For additional information concerning Clarksville's involvement in the proposed Exit Loan, see correspondence from Clarksville Town Council attached hereto as **Exhibit H**.

18

sublease the KMCREI Real Property to KMCREI pursuant to terms substantially similar to the Master Lease Agreement, with the obligations thereunder being guaranteed by Medical Asset Investors of Kentuckiana, LLC ("MAIK"), Mike Morley, Ed Ballard and Linda Julian (collectively, the "Guarantor");[3] and KMCREI will sublease the KMCREI Real Property to the Debtor pursuant to terms substantially similar to the Master Lease Agreement; or (ii) Argenta will lease the KMCREI Real Property to KMCREI pursuant to the Master Lease Agreement, with the obligations thereunder being guaranteed by the Guarantor; and KMCREI will sublease the KMCREI Real Property to the Debtor pursuant to terms substantially similar to the Master Lease Agreement. Under either scenario, the Debtor's obligations under its sublease will be in the nature of a "triple-net" lease payment, with monthly rent obligations sufficient to satisfy KMCREI's post-confirmation obligations under its plan of reorganization. As of the date this Disclosure Statement is submitted, Argenta has not yet submitted the above scenarios to underwriting for approval due to the brief time periods in which the Guarantor and Clarksville have notified Argenta of their respective commitments to the proposed restructuring.

6.     *Post-Confirmation Ownership of the Debtor*

Upon cancellation of the pre-petition membership interests in the Debtor pursuant to the Plan, the Debtor shall cause a distribution of new membership interests to the Guarantor and the physicians contributing the Post-Confirmation Investment (collectively, the "New Members"). The post-confirmation membership interests in the Debtor shall be divided 51% to the Guarantor in consideration of serving as an accommodation party to the Master Lease Agreement, and 49% to KI II, LLC ("KI II") in consideration of its contribution of the Post-Confirmation Investment. KI II will consist of one or more individuals who are presently members of KI, as well as additional practicing physicians from the greater-Louisville area who have sought participation in a physician-owned hospital such as KMC. The Debtor is unable to identify the ownership of KI II as of the Effective Date with certainty because it will generate $2,000,000.00 of the Post-Confirmation Investment through the sale of membership units, on a $50,000.00 per unit basis, with each such unit requiring a $10,000.00 cash payment on or before the Effective Date, with the balance to be paid within eighteen (18) months of the Effective Date. The remaining $1,854,000.00 of the Post-Confirmation Investment will be generated in part by a reinvestment of the disbursements made to doctors ($504,000.00) for unpaid compensation for on-call services rendered since the Petition Date, and in part by reinvestment of $1,350,000.00 of the total $3,400,000.00 paid to Hall Robb through certain of the members of Hall Robb who are also members of KI.

7.     *Post-Confirmation Management*

Subject to the approval and consent of the Exit Lender, the Debtor's post-confirmation operations will be managed by a Board of Managers (the "Board"). The members of the Board will be elected by the New Members.

**E.     Risk Factors**

The holder of a claim against the Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote

---

[3] For additional information concerning MAIK's involvement in the proposed Exit Loan, see correspondence from MAIK attached hereto as **Exhibit I**.

to accept or reject the Plan. These factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

      1.    *The Debtor may not be able to obtain confirmation of the Plan.*

The Debtor cannot insure that it will receive the requisite acceptances from the holders of allowed claims to confirm the Plan. Even if all impaired classes accept or could be deemed to have accepted the Plan, the Debtor cannot insure that the Bankruptcy Court will confirm the Plan. One or more non-accepting holder(s) of claim(s), or the United States Trustee, might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or the Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for Confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) confirmation of the Plan is not likely to be followed by liquidation or a need for further financial reorganization; (b) the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (c) the value of distributions to dissenting holders of claims and interests will not be less than the value of distributions such holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code; and (d) the Plan and the Debtor have otherwise complied with the applicable provisions of the Bankruptcy Code. Although the Debtor believes that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

If the Plan is not confirmed, it is unclear whether a restructuring of the Debtor could be implemented and what distributions holders of claims ultimately would receive with respect to their claims. If an alternative reorganization could not be agreed to, it is possible that the Debtor would have to liquidate its assets, in which case it is likely that holders of claims would receive substantially less favorable treatment than they would receive under the Plan.

      2.    *The actual allowed amounts of claims may vary from the estimated claims and reduce the percentage recovery on general unsecured claims.*

The estimated claims described in the Plan and Disclosure Statement are based on various assumptions and the actual allowed amounts of claims may significantly differ from the estimates. In addition, the Debtor may have omitted, whether by error or ignorance, a claim that is ultimately proven to be an Allowed Claim which could alter the recovery realized by holders of general unsecured claims. Should any of the underlying assumptions relied upon in the estimation of claims ultimately prove to be incorrect, the actual allowed amounts of claims may vary from the estimated claims contained herein. As a result, such differences may materially and adversely affect the percentage recovery on Class 3 general unsecured claims under the Plan.

      3.    *The Debtor may attempt to achieve confirmation notwithstanding an inability to obtain necessary votes for consensual confirmation.*

Pursuant to the "cramdown" provisions of §1129 of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the Debtor's request if (i) at least one impaired class has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such class) and (ii) with respect to each impaired class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable"

with respect to impaired classes. In accordance with § 1129(a)(8) of the Bankruptcy Code, the Debtor will request that the Bankruptcy Court confirm the Plan without the acceptance of all impaired classes entitled to vote.

The Debtor hereby reserves the right to modify the terms of the Plan as necessary for confirmation without the acceptance of all impaired classes. Such modification could result in less favorable treatment for any non-accepting classes than the treatment currently provided for in the Plan. Such less favorable treatment could include a distribution of property of a lesser value than that currently provided in the Plan or no distribution of property whatsoever.

4.    *The Debtor may be unable to obtain necessary exit financing.*

The Debtor and KMCREI have identified Argenta as a lender willing to make the Exit Loan to fund the improvements to and continued operations of the Hospital, and have identified MAIK as a willing "backstop" guarantor to induce Clarksville to participate in the Exit Loan as required for Argenta's approval. Clarksville's participation in the lease arrangements described above remains contingent upon completion of due diligence with respect to the Guarantor. Although the Guarantor has expressed a willingness to proceed with the Exit Loan regardless of Clarksville's participation therein, such an arrangement would remain contingent upon approval of the Guarantor by Argenta's underwriters, which has not heretofore been sought by Argenta. To the extent that the Debtor can control or facilitate the evaluations and approvals necessary for approval of the Exit Loan under either scenario, Debtor and its management will diligently make all reasonable efforts to close the exit financing transaction and consummate the Plan.

5.    *The exit financing and Plan may not result in the Debtor being profitable.*

The Debtor, KMCREI and Argenta have agreed to a multi-tiered transaction which the Debtor believes will improve its capital structure and maximize its operational efficiencies in manners that will enable the Debtor to meet its obligations under the Plan. While the parties' independent decisions to engage in the transactions contemplated by the Plan are the direct result of negotiations and the exercise of business judgment among the professionals and advisors of the respective entities, the risks associated with the necessary transactions should not be overlooked. While the exit financing plan is designed with the intention of improving the Hospital and increasing the Debtor's ability to consistently earn a profit, the Debtor's emergence from chapter 11 could be tedious to the point of reducing productivity and inhibiting the profitability of the Hospital after Confirmation.

6.    *The Debtor's financial projections are inherently uncertain and actual results may materially differ.*

The Debtor's financial personnel have proceeded in utmost good faith in their attempt to produce a realistic projection of the company's financial position over the relevant years in which substantially all of the Debtor's restructured debts will be serviced under the Plan. Nonetheless, any undertaking in the area of financial projections necessarily requires a host of assumptions, and events and circumstances frequently do not occur as expected. The degree of difference between the projected and actual results cannot be known, but such differences may prove to be material with respect to the Debtor's financial well-being following Confirmation.

Because the actual results achieved throughout the periods covered by the financial projections may vary from the projected results, the projections should not be relied upon as a

guaranty, representation or other assurance of or against the actual results that will occur. The Debtor does not intend to update the financial projections; thus, the financial projections will not reflect the impact of any subsequent events not already accounted for.

F.      **Executory Contracts and Unexpired Leases**

The Plan, in Table 7.01, lists all executory contracts and unexpired leases that the Debtor will assume under the Plan.  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any.  Table 7.01 also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If a party objects to the assumption of its unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, it must file and serve an objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Table 7.01 will be rejected under the Plan.  Consult your adviser or attorney for more specific information about particular contracts or leases.

If a party objects to the rejection of its contract or lease, it must file and serve an objection to the Plan within the deadline for objecting to the confirmation of the Plan (the "Objection Deadline").

***Unless the Debtor has rejected a particular lease or contract prior to entry of the Confirmation Order, the deadline for filing a Proof of Claim based on a Claim arising from the rejection of a lease or contract is twenty-eight (28) days after entry of the Confirmation Order.***  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Bankruptcy Court orders otherwise. For the avoidance of doubt, any Claim arising from the rejection of a contract or lease that has been approved by the Bankruptcy Court prior to entry of the Confirmation Order shall remain subject to the March 3, 2011 deadline established by the Bankruptcy Court's Bar Date Order [Document No. 169] (the "Bar Date Order") unless specifically authorized to be filed at a later date by a Final Order of the Bankruptcy Court.

G.      **Tax Consequences of Plan**

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.***

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

1.      *General*

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW.  NO RULING HAS BEEN REQUESTED FROM THE IRS AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS, NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF INTERESTS IN THE DEBTORS.  THIS DESCRIPTION DOES NOT DISCUSS THE POSSIBLE STATE TAX OR NON-U.S. TAX CONSEQUENCES THAT MIGHT APPLY TO THE DEBTORS OR TO HOLDERS OF CLAIMS.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM.  HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

2. *Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally*

The federal income tax consequences of the implementation of the Plan to the holders of allowed claims will depend, among other things, on the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder receives distributions under the Plan in more than one taxable year, whether the holder's claim is allowed or disputed on the Effective Date, and whether the holder has taken a bad debt deduction or worthless security deduction with respect to its claim.

a. **Recognition of Gain or Loss**

In general, a holder of an allowed claim should recognize gain or loss equal to the amount realized under the Plan in respect of its claim less the holder's tax basis in the claim.  Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the allowed claim and the holder, the length of time the holder held the claim and whether the claim was acquired at a market discount.  If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation.  The holder's tax basis for any property received under the Plan generally will equal the amount realized.  The holder's amount realized generally will equal the sum of the cash and the fair market value of any other property received by the holder under the Plan on the Effective Date or a subsequent distribution date, less the amount (if any) treated as interest, as discussed below.

b. **Post-Effective Date Distributions**

Because certain holders of allowed claims, including disputed claims that ultimately become allowed claims, may receive cash distributions after the Effective Date, the imputed interest provisions of the Internal Revenue Code may apply and cause a portion of the subsequent

distribution to be treated as interest.  Additionally, because holders may receive distributions with respect to an allowed claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred.  All holders of allowed claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their claims.

### c.    Receipt of Interest

Holders of allowed claims will recognize ordinary income to the extent that they receive cash or property that is allocable to accrued but unpaid interest which the holder has not yet included in its income.  If an allowed claim includes interest, and if the holder receives less than the amount of the allowed claim pursuant to the Plan, the holder must allocate the Plan consideration between principal and interest.  The holder may take the position that the amounts received pursuant to the Plan are allocable first to principal, up to the full amount of principal, and only then to interest.  However, the proper allocation of Plan consideration between principal and interest is unclear and holders of allowed claims should consult their own tax advisors in this regard.   If the Plan consideration allocable to interest with respect to an allowed claim is less than the amount that the holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

### d.    Bad Debt or Worthless Securities Deduction

A holder who receives in respect of an allowed claim an amount less than the holder's tax basis in the claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under § 166(a) of the Internal Revenue Code or a worthless securities deduction under § 165(g) of the Internal Revenue Code.  The rules governing the character, timing and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed.  Holders of allowed claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 3.    *Information Reporting and Withholding*

Under the Internal Revenue Code's backup withholding rules, the holder of an allowed claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.  Holders of allowed claims may be required to establish exemption from backup withholding or make arrangements with respect to the payment of backup withholding.

## IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Bankruptcy Code.  These include the requirements that:  the Plan must be proposed in good faith; at

least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

A.    **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed (or allowed for voting purposes) and (2) impaired.

In this case, the Plan Proponent believes that classes 2-A, 2-B, 2-C, 2-D, 2-E, 2-G and 3 are impaired and that holders of allowed claims in each of these classes are therefore entitled to vote to accept or reject the Plan. Although holders of Class 4 Interests are impaired under the Plan, Class 4 members are deemed to have rejected the Plan because they will not receive or retain any property under the Plan on account of their interests in the Debtor. The Plan Proponent believes that classes 1 and 2-F are unimpaired and that holders of interests in that class, therefore, do not have the right to vote to accept or reject the Plan.

1.    *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. A claim or equity interest is allowed only if the creditor or equity interest holder has timely filed a proof of claim or interest in accordance with the Bar Date Order or other applicable Bankruptcy Court Order, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Bankruptcy Rules.

2.    *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Bankruptcy Code, a class is considered impaired if the Plan alters the legal, equitable or contractual rights of the members of that class.

3.    *Who is **Not** Entitled to Vote*

The holders of the following types of claims and equity interests are *not* entitled to vote:

- claims and equity interests that have been disallowed by a Final Order of the Bankruptcy Court;

- other claims or equity interests that are not "Allowed Claims" or "Allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes;

- claims or equity interests in unimpaired classes;

- claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Bankruptcy Code;

- claims or equity interests in classes that do not receive or retain any value under the Plan; and

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and/or to the Adequacy of the Disclosure Statement.***

        4.    *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

    B.    **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Bankruptcy Court cannot confirm the Plan unless (i) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (ii) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by cramdown on non-accepting classes, as discussed later in Section IV.B.2.

        1.    *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (i) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (ii) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

        2.    *Treatment of Non-Accepting Classes*

Even if one or more impaired classes reject the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner prescribed by § 1129(b) of the Bankruptcy Code. A plan that binds non-accepting classes is commonly referred to as a cramdown plan. The Bankruptcy Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting

requirements of § 1129(a)(8) of the Bankruptcy Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a cramdown confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

### C.     Best Interests of Creditors

To confirm the Plan, the Bankruptcy Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity holders would receive in a chapter 7 liquidation. The Debtor hereby submits that the cumulative amount of its liabilities secured by property of the estate, liabilities arising since the Petition Date and pre-petition liabilities far exceed the cash value that its assets would obtain in a forced sale such that a liquidation under chapter 7 of the Bankruptcy Code would not generate any money or property for unsecured creditors to receive or retain. Thus, Debtor submits that the restructuring and payments to holders of Allowed Claims proposed herein is in the best interests of creditors.

### D.     Feasibility

The Bankruptcy Court must also find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan. To that end, the Debtor has reviewed its books and records of operations to develop what it considers to be reasonable expectations of future production and earning upon consummation of the Plan. The Debtor's financial projections, in light of its officers' knowledge and experience in the market, are presented in **Exhibit J**.

Because events and circumstances frequently do not occur as expected, there are likely to be material differences between the projected and actual results. The Debtor does not intend to update these financial projections following Confirmation.

## V.     EFFECT OF CONFIRMATION OF PLAN

### A.     Discharge of Debtor

On the Confirmation Date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtor shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Bankruptcy Rules, or (iii) of a kind specified in § 1141(d)(6)(B). After the Effective Date your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

### B.     Injunctions and Releases

***As of the Effective Date, in consideration of the compromises, settlements, agreements, and transfers embodied in the Plan, the Debtor, on its own behalf and as representative of the bankruptcy estate, all guarantors or co-obligors of the Debtor, and each holder of a Claim or Interest shall be enjoined from pursuing or asserting any claims (including derivative claims),***

*obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the right to enforce the Debtor's obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the chapter 11 case, the Plan or the Disclosure Statement that such entity has, had or may have against any of (i) the Debtor; (ii) the Debtor's guarantors or co-obligors; and/or (iii) a holder of a Claim or Interest; provided, however, that this shall not enjoin or release any party from any cause of action existing as of the Effective Date, based on (i) the Internal Revenue Code or other domestic state, city or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city or municipality, or (iii) any criminal laws of the United States or any domestic state, city or municipality. Nothing set forth in the Plan or the Confirmation Order shall be construed to preclude the United States from pursuing any cause of action against any of the released parties based upon any civil laws of the United States.*

### C.    Modification of Plan

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Bankruptcy Court may require a new disclosure statement and/or revoting on the Plan.

The Plan Proponent may also seek to modify the Plan at any time after confirmation only if (i) the Plan has not been substantially consummated *and* (ii) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### D.    Notice of Effective Date

Within seven (7) days of the occurrence of the Effective Date, the Plan Proponent, or such other party as the Bankruptcy Court shall designate in the Confirmation Order, shall file a Notice of the Effective Date.

### E.    Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Bankruptcy Rules, the Plan Proponent, or such other party as the Bankruptcy Court shall designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

## VI.    RECOMMENDATION AND CONCLUSION

It is Debtor's position that the Plan is substantially preferable to a liquidation under chapter 7 of the Bankruptcy Code. It is important that you exercise your right to vote on the Plan. It is the belief of the Debtors that the Plan fairly and equitably provides for the treatment of all claims against the Debtor. **The Debtor recommends and urges all creditors to vote to accept the Plan.**

IN WITNESS WHEREOF, the Debtor has submitted this Disclosure Statement this 16th day of January, 2012.

DEBTOR AND DEBTOR IN POSSESSION

By: /s/ Timothy J. Donahue
    TIMOTHY J. DONAHUE
    Chief Restructuring Officer
    Kentuckiana Medical Center, LLC

## INDEX OF EXHIBITS

Exhibit

A.    Preliminary Statement of Disputed Claims

B.    Valuation of Debtor's Material Assets

C.    Income Statement for Calendar Year 2011 (monthly)

D.    Allowed Administrative Expense Claims

E.    Proposed Use of Funds Statement

F.    Pre-Approval Letter from Argenta

G.    Capital Expenditure Detail

H.    Correspondence from Clarksville

I.    Correspondence from MAIK

J.    *Pro Forma* for Fiscal Years 2012, 2013, 2014, 2015 and 2016

G:\doc\DMC\Kentuckiana Medical Center, LLC\Pldgs\Disclosure Stmt - 1st Amd (Argenta).doc